**BURKE et al. v. SANITARY DIST. OF CHICAGO et al.**

Circuit Court of Appeals, Seventh Circuit. April 8, 1929.

Rehearing Denied May 22, 1929.

No. 4020.

John M. Zane, of Chicago, Ill., for plaintiffs in error.

Morton S. Cressy and James M. Sheean, both of Chicago, Ill., for defendants in error.

Before ALSCHULER, PAGE, and ANDERSON, Circuit Judges.

PAGE, Circuit Judge. This action of ejectment, filed April 21, 1921, was brought by the devisees of James C. Burke, deceased, to recover lands taken by defendant, the Sanitary District of Chicago (herein called District), from John C. Burke and James C. Burke, in 1892 and 1893, through condemnation. The claim is that the District abandoned the lands in suit, and that plaintiffs, through the will of James C. Burke, deceased, own an undivided half interest therein in fee. An instructed verdict was returned for defendants.

The Sanitary District presents, in the main, two defenses: (a) That when it took the Burke lands it took them in fee, leaving no interest in Burke or his heirs; and (b)

that in any event it has not abandoned the lands in question.

Whether, under the statutes of its creation, the Sanitary District took the fee of lands it condemned was elaborately discussed by the late Judge Dibell, who for many years was a presiding judge of one of the Appellate Courts of Illinois, in an opinion which he delivered as judge of the Will county, Illinois, circuit court, in which he reached the conclusion that upon condemnation the Sanitary District took the fee. Upon appeal to the Supreme Court of Illinois, that court, while affirming the judgment of the circuit court, did not pass on that question, but decided the case upon different grounds. Allen v. Haley, 169 Ill. 532, 48 N. E. 478. Other than this, we do not find that the question has been determined by the Illinois courts.

Our views on the question of abandonment make it unnecessary for us to decide the first proposition, and we refrain from discussing it.

The District was organized under a statute of the state of Illinois passed May 29, 1889. Sess. Laws Ill. 1889, p. 125 (3 Callaghan's. Ill. St. Ann. c. 42, par. 337). The condemnation case, appealed to the Supreme Court of Illinois, is found in Burke v. Sanitary District, 152 Ill. 125, 38 N. E. 670. Possession was taken in 1893, and in 1900 what is commonly known as the Chicago Drainage Canal was completed.

The Burke land, containing about 300 acres, is nearly a mile long, and at places about half a mile wide. Roughly speaking, it occupies, in width, all of the space between the Desplaines river, on the northwest side, and the Illinois and Michigan Canal, on the southeast side. It was low, swampy land, used solely for grazing. At the time of this trial, there were: In meadow and pasture, 40 acres; under cultivation, 58 acres; in mud flats, brush lands, and scattered timber, 98 acres; canal waters, 49 acres; other waters, 8 acres. The Drainage Canal runs through nearly the whole length of the Burke land, and its width, between designated dock lines, is 240 feet. It is sought to recover an undivided one-half of the land, except certain railroad rights of way, and except the strip occupied by said main channel, its prism, banks, and berm— a strip of land stated in the pleadings to be 296 feet wide. However, the actual width of the canal, from water's edge to water's edge, was 300 feet, and from the top of its banks, on either side, its average width throughout was 365 feet. In the course of

the construction of the canal, it became necessary to make, for some distance, a new channel for the Desplaines river. From the material excavated, large so-called spoil banks were made, and yet remain upon the Burke land. Some of them are between the channel of the Drainage Canal and the Illinois and Michigan Canal. One, on the northwest side of the Burke land, was placed with a view of strengthening the bank of the Desplaines river.

The acts of abandonment relied upon are as follows:

■ *Platting.* Lands on either side of the channel, from Robey street, in Chicago, to the Will county line, a distance of 20 miles, and claimed to be owned by the District, were platted into lots of various sizes. Beginning at Robey street, they were numbered from 1 to 274. It is not a statutory plat, and there is no dedication to the public of any street, alley, or other public place. There are legitimate purposes to be served by platting the lands into parcels and designating them by number. The fact of platting is no evidence of an intention to abandon.

*Advertising.* There was a sign near the Burke property, calling attention to desirable factory sites on the District right of way. The offer was to lease only, and did not mention the Burke property. An advertising prospectus is in the record, and there are reproduced on various pages thereof sections of the platted and numbered lots, beginning at Robey street, and covering all lots up to and including lot 133. Lots 132 and 133 are the only lots mentioned that are in the Burke property. Opposite the lot numbers are shown the appraised values of the tracts. That information was given to show the rental rates, the statement being: "The annual rental of each lot or tract is based on 5 per cent. of its appraised valuation." We find no offer of sale, other than that relating to the material in some of the spoil banks.

■ *Leases.* Leases are shown to three tenants for farming and grazing purposes. In each is reserved to lessee the right to cancel, on short notice. A lease to the Corn Products Manufacturing Company, for 99 years, is for a strip of land about 1,500 feet long on the southeasterly side of the main channel and of the width of about 400 feet to the northeasterly line of the Illinois and Michigan Canal. The lease contains the following provision:

"The said lessor may at any time enter upon said premises for the purpose of wid-

ening its said main channel, and may at any time take so much of said premises as may be necessary for the widening of said main channel."

There is the provision that lessee may take daily from the channel 25,000,000 gallons of water, provided it returns daily an equal quantity. Lessee agrees to pay all water rates, taxes and special assessments levied upon the leased premises. The lease provides that lessee shall build and maintain a dock along the entire front of the leased property on the channel, in accordance with the Drainage District's plans and specifications, and it also agreed to excavate, for one-half the entire width of the canal, under the direction of the District's engineer, so as to deepen the channel to the grade originally established. It is further provided that the District shall have the right to erect poles on the south 40 feet of the strip and to maintain them for the purpose of carrying wires. There was also a provision that the lessee will remove the spoil bank on the leased premises. All lessees are parties defendant.

"To constitute an abandonment there must be not only an actual relinquishment of the property, but an intention to abandon it. The intention of the party * * * is the important fact." Chicago & E. I. R. Co. v. Clapp, 201 Ill. 418, 425, 66 N. E. 223, 225. See, also, Lindblom v. Rocks, 146 F. 660, 664 (9th C. C. A.).

Durfee v. Peoria, D. & E. Ry. Co., 140 Ill. 435, 30 N. E. 686, was a case of nonuser. The railroad company leased, for 10 years, the right to use a part of another railway company's tracks, and thereupon ceased to use the tracks on the land in question. The rails and ties were taken up, and the land was fenced in with the land of the former owner, from whom it had been taken by condemnation, and who paid taxes on it. The evidence showed that the railroad company intended to resume the running of trains over the old right of way. The court said (page 439 [30 N. E. 687]):

"Under this evidence we perceive no ground whatever upon which it could be held that the railroad company had lost its right of way by abandonment."

Clearly, we think, there was nothing in the three leases to indicate abandonment. We shall consider the Corn Products lease further.

The act under which the District was formed is "An act to create Sanitary Districts, and to remove obstructions in the Desplaines and Illinois rivers." Laws 1889, p. 126. Section 1 provides:

"That whenever any area of contiguous territory within the limits of a single county shall contain two or more incorporated cities, towns or villages, and shall be so situated that the maintenance of a common outlet for the drainage thereof will conduce to the preservation of the public health, the same may be incorporated as a sanitary district under this act. * * * No territory shall be included in any municipal corporation formed hereunder which is not situated within the limits of a city, incorporated town or village, or within three miles thereof. * * *"

Section 12 authorizes the trustees of the District to levy and collect taxes within the territorial limits of the District, and there are other provisions relating to taxation and special assessment. Although there is a limitation as to the territory that may be included and taxed in any district, there is a provision by which other territory may have the use of the channel on terms to be agreed upon. Section 20 provides:

"Any channel * * * which shall cause the discharge of sewage into or through any river or stream of water beyond or without the limits of the district * * * shall be of sufficient size and capacity to produce a continuous flow of water of at least two hundred cubic feet per minute for each one thousand of the population of the district drained thereby, and the same shall be kept and maintained of such size and in such condition that the water thereof shall be neither offensive or injurious to the health of any of the people of this state, and before any sewage shall be discharged into such channel or outlet all garbage, dead animals, and parts thereof, and other solids shall be taken therefrom."

It is also provided that:

"If the population of the district draining into such channel shall at any time exceed 1,500,000, such channel shall be made and kept of such size and in such condition that it will produce and maintain at all times a continuous flow of not less than 20,000 cubic feet of water per minute for each 100,000 of the population of such district. * * *"

There are many other important provisions in that section, giving authority to and placing burdens upon the District. Section 24 provides:

"When such channel shall be completed, and the water turned therein, to the amount of 300,000 cubic feet of water per minute,

.the same is hereby declared a navigable stream, and whenever the general government shall improve the Desplaines and Illinois rivers, for navigation, to connect with this channel, said general government shall have full control over the same for navigation purposes, but not to interfere with its control for sanitary or drainage purposes."

It is provided that compliance with the act may be compelled by suits brought by the Attorney General, and the District is liable for damages to those wrongfully injured. Section 7 reads:

"The board of trustees of any sanitary district organized under this act shall have power to provide for the drainage of such district by laying out, establishing, constructing and maintaining one or more main channels, drains, ditches and outlets for carrying off and disposing of the drainage (including the sewage) of such district, together with such adjuncts and additions thereto as may be necessary or proper to cause such channels or outlets to accomplish the end for which they are designed in a satisfactory manner. * * * "

Section 8 provides:

"Such sanitary district may acquire, by purchase, condemnation, or otherwise, any and all real and personal property, right of way and privilege, either within or without its corporate limits that may be required for its corporate purposes; * * * and, when not longer required for such purposes, to sell, convey, vacate and release the same, subject to the reservation contained in section 7, relating to water powers and docks."

Various amendments have been made to the statute of 1889, and it is urged that some of them are unconstitutional because they embody an attempt to bestow upon the District, and empower it to dispose of, a greater title than was taken by condemnation. While the Legislature could not, by subsequent legislation, bestow upon the District any greater title than that taken on condemnation, yet it is lawful for a Legislature to place upon a municipality burdens, duties, and obligations incident to the general purpose of the original legislation. The original act in fact foreshadows the possibility of such legislation by providing in section 22:

"Nothing in this act contained shall be so construed as to constitute a contract or grant between the state of Illinois and any sanitary district formed under its provisions, or to prevent, debar or deprive the state of Illinois from, at any time in the future, altering, amending or repealing this act, or imposing any conditions, restrictions, or requirements other, different or additional to any herein contained upon any sanitary district which may be formed hereunder."

When the land was condemned, the Burkes had notice not only of the terms and conditions then imposed upon the District, but also had notice that the land was taken for such other purposes as might be imposed upon the District by the Legislature.

It is apparent that the obligations and duties that the District was required to meet at its inception were not the measure of the obligations and duties that the District was, or might be, required by the act to meet and perform during the years that were then before it, or during the years that are yet to come. The city of Chicago, which constituted most of the territory of the District when it was founded, then had 1,000,000 people. Since then the territory has been nearly doubled, and the people within it have trebled. The main channel extends from Robey street, in the city of Chicago, 32 miles, through the counties of Cook and Will, to Joliet. The District is charged with the duty and responsibility of so taking care of the drainage and the sewage brought to it from the city of Chicago and other cities within its territory that the sewage will not be a menace either to the people of the District or to those using the waters of the Illinois and Desplaines rivers. It cannot now be told what lands or other property, what channels or other facilities, will be necessary to enable the District to carry out the obligations imposed upon it by law. The amount of land taken in condemnation was not contested by the Burkes, and they were awarded by the jury the full fair cash market value thereof, and it was paid by taxation of the people. There is no equitable reason why anything shown in the record should be held to be an abandonment, where it is clearly shown that there was an intent not to abandon the property.

It has always been contended by the District that it owns the fee in the Burke land. We do not decide this question, but the claim has been apparently made in good faith, and that contention excludes any idea of intent to abandon. We have not overlooked the fact that in some cases intent may be presumed from the nature of the acts done.

The evidence in this case, taken about 25 years after the opening of the channel, shows that at that time there was 11 feet of sediment and sewage in its bottom, nearly one-third of its total depth. It seems probable that, unless the sediment is removed,

the channel will soon lack the depth necessary for either drainage or navigation. One of the things required of the Corn Products Manufacturing Company, under its lease, was that it should excavate, to its original depth, one-half of the channel in front of the property leased. Whether excavated by the Corn Products Manufacturing Company or by the District itself, there is nothing in the record from which we can tell that the land in question will not be needed in the future, as it was at the time of the original excavation, for the economic disposition of the excavated material.

The record does not show the kind and character of docks required by the lease to be constructed by the Corn Products Manufacturing Company. There is nothing from which we can determine whether all of the land covered by the lease will be required for the purposes reserved therein to the lessor: (1) The right to erect poles and wires on a 40-foot strip along the Illinois and Michigan Canal; (2) the right to use any necessary part of the leased land for the purpose of widening the channel. Nor can it be known how much of the land will be necessary to enable the lessee to construct and maintain docks, required by the lease. The Supreme Court of Ohio said: "A dock is a place for vessels, either excavated from the land, or surrounded by wharves." Bingham v. Doane, 9 Ohio, 165, 167. On one of the exhibits there are shown many U-shaped slips, extending out from the Chicago river. It is a matter of common knowledge that docks are so constructed that vessels may be brought within the slips for loading and unloading. While docks so constructed increase the water line and enable vessels to be unloaded and loaded outside the main channel, they at the same time greatly increase the width of the land necessary for their construction. So far as we know from the record, the construction indicated above may be the construction required by the lease. One of the plats shows a sewer from Argo across the leased property, emptying into the channel. Although this is a 99-year lease, we do not think that, under all the circumstances, it was improperly made. To lease docks and sell power, to widen the channel, or to construct additional channels are matters not limited as to time. But, if it can be said that the lease to the Corn Products Company is one beyond the power of the District to make, yet as the District was established to meet a great public necessity, at great expense to the people, it should not be held that a wrongful use by the Dis-

trict of a part of its property amounts to abandonment, particularly where such use, as here shown, is intimately connected with the purposes covered by the statute.

Ordinarily, the question of abandonment is for the jury, but where, as we conclude to be the case here, the evidence, with all the inferences fairly to be drawn therefrom, is insufficient to show abandonment, there may and should be a directed verdict for the defendant.

The judgment is affirmed.